**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| CENK UYGUR and JOHN WARD,<br><br>          Plaintiffs,<br><br>   v.<br><br>SOUTH CAROLINA; HENRY MCMASTER, in his official capacity as Governor of South Carolina; ALAN WILSON, in his official capacity as Attorney General of South Carolina; MARK HAMMOND, in his capacity as Secretary of State of South Carolina; SOUTH CAROLINA DEMOCRATIC PARTY; SOUTH CAROLINA STATE ELECTION COMMISSION, JOHN WELLS, and HOWARD M. KNAPP, in their official capacities as Chairman and Executive Director, respectively, of the South Carolina State Election Commission,<br><br>          Defendants. | Case No.  3:23-6879-JFA<br>_____ |

---

**VERIFIED COMPLAINT FOR**
**DECLARATORY AND EMERGENCY INJUNCTIVE RELIEF**

---

## NATURE OF PROCEEDING

1.      Although many of the Constitution's ugliest anachronisms have been neutralized by amendment, the document still carries some traces of our Nation's troubled past. One vestige that has never received sufficient attention is the "Natural Born Citizen Clause," which discriminates based on national origin by prohibiting naturalized citizens from serving as President

or Vice President.  Although the Executive Branch is a co-equal branch of our tri-partite government, the natural born citizenship restriction does not apply to any other office or branch of government, and there is no defensible rationale for its continued existence.

2.      This is an action under 42 U.S.C. § 1983 to correct this wrong and enforce rights guaranteed to Plaintiffs by the First, Fifth, and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1964 (Title VI).  At issue is South Carolina's statute governing presidential preference primaries, S.C. Code Ann. § 7-11-20 ("Ballot Access Statute" or the "Statute"), and the South Carolina Delegate Selection Plan[1] ("Delegate Selection Plan" or the "Plan"), both of which rely upon the Natural Born Citizen Clause found in Article II, Section 1, clause 5 of the United States Constitution.  The Statute and Plan forbid the South Carolina Democratic Party from certifying to the South Carolina State Election Commission the name of any candidate for placement on a primary ballot who is not a natural born citizen.

3.      By discriminating on the basis of national origin and limiting ballot access to natural born citizens only, the Statute and Plan abridge Plaintiffs' core First Amendment rights of free speech and association, violate due process, citizenship, privileges and immunities, and equal protection rights guaranteed by the Fifth and Fourteenth Amendments, and contravene rights secured by the Civil Rights Act of 1964.

4.      Plaintiffs are a naturalized American citizen who is a candidate for President of the United States and a resident in South Carolina that wishes to vote for said candidate in the Presidential Preference Primary on February 3, 2024.  Together, they seek declaratory relief declaring that the Natural Born Citizen Clause has been nullified and repealed by the Fifth and

---

[1] S.C. Delegate Selection Plan, *available at* https://drive.google.com/file/d/1cs6Vgh7NCh-KLxxTdO8mqDY8lGn3oeyp/view?usp=sharing (last visited Dec. 21, 2023).

Fourteenth Amendments to the Constitution; a declaratory judgment that South Carolina's Ballot Access Statute, S.C. Code Ann. § 7-11-20, and the Delegate Selection Plan violate rights guaranteed to Plaintiffs by the First, Fifth, and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983; a declaratory judgment that South Carolina's Ballot Access Statute, and the Delegate Selection Plan violate Title VI, 42 U.S.C. § 2000d et seq. of the Civil Rights Act of 1964; injunctive relief prohibiting Defendants from applying the Ballot Access Statute and Delegate Selection Plan to the extent they disqualify naturalized citizens from appearing on the state's primary ballot; and mandatory injunctive relief requiring the Defendants to place the candidate's name on the ballot for the Presidential Preference Primary on February 3, 2024.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction over this action pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3).

6.     This suit is authorized by 42 U.S.C. § 1983.

7.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

8.     Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391(b).

9.     Venue is proper in the Columbia division pursuant to Local Rule 3.01(A)(1).

## PARTIES

10.     Plaintiff Cenk Uygur is a Turkish-born, naturalized American citizen who resides in Los Angeles, California and is a candidate for President of the United States. Mr. Uygur has spent almost his entire life in the United States, having immigrated to the country with his parents when he was just eight years old. He graduated from East Brunswick High School in East Brunswick, New Jersey and later obtained an undergraduate degree from the Wharton School of

the University of Pennsylvania and a Juris Doctor degree from Columbia Law School. Mr. Uygur is best known as a political commentator, media host, and attorney.

11.     He is the co-founder and host of "The Young Turks," a progressive news and commentary program that has almost 6 million followers on YouTube. His online videos have been viewed more than 6.5 billion times. Initially starting as a radio show in 2002, The Young Turks expanded to online platforms, becoming a significant presence in digital media. Mr. Uygur is known for his outspoken, progressive approach. He advocates for progressive policies and often critiques mainstream media and political figures. In addition to his media work, Mr. Uygur has been involved in political activities, including a brief run for Congress in California's 25th Congressional District in 2020. Simply put, Mr. Uygur has been a mainstay in political discourse for over two decades. His influence extends across various digital platforms, where he continues to engage in political and social discussions.

12.     Plaintiff John Ward is a United States citizen and a resident of the State of South Carolina. Mr. Ward is a resident and registered voter in Horry County, South Carolina. Mr. Ward would like to have the opportunity to vote for Cenk Uygur in the Presidential Preference Primary on February 3, 2024. Mr. Ward is aware of and not confused about Mr. Uygur's status as a naturalized citizen. Although Mr. Ward believes that the Natural Born Citizen Clause has been— or in the alternative, should be—repealed, he is aware of the possibility that Mr. Uygur's status as a naturalized citizen may preclude him from being eligible to serve as President of the United States if elected. Nonetheless, Mr. Ward seeks to exercise his First Amendment freedoms by voting for Mr. Uygur in the Presidential Preference Primary as a way of showing solidarity with Mr. Uygur's policies and ideas. Other than Mr. Uygur, no other candidate aligns with Mr. Ward's policy beliefs. Accordingly, if Mr. Uygur is omitted from the Presidential Preference Primary,

Mr. Ward is unlikely to participate in the primary election. Finally, Mr. Ward does not believe that the Democratic Presidential Preference Primary ballot, as it currently stands, is in any way crowded.

13.    Defendant, the State of South Carolina, is a State of the United States that entered the Union as the eighth State in 1788. The State of South Carolina is a "program or activity" within meaning of the Civil Rights Restoration Act of 1987, 42 U.S.C. § 2000d-4a, and a recipient of federal assistance within meaning of Title VI's implementing regulations, 34 C.F.R. § 100.13(i), to assist with various aspects of the State's electoral process.

14.    Defendant, Henry McMaster, is the Governor of South Carolina, and is being sued in his official capacity. Defendant McMaster is responsible under South Carolina law for ensuring that "the laws be faithfully executed." S.C. Const. art. IV, § 15.

15.    Defendant, Alan Wilson is the Attorney General of the State of South Carolina and is the head of the Office of Attorney General. He is being sued in his official capacity. Defendant Wilson is responsible under South Carolina law for enforcement of South Carolina's law.

16.    Defendant Mark Hammond is the Secretary of State of South Carolina and is the head of the Office of the Secretary of State. He is being sued in his official capacity. Upon information and belief, Defendant Hammond, on behalf of South Carolina, applied for and received federal funds to assist with various aspects of the State's electoral process.

17.    Defendant South Carolina Democratic Party ("SCDP") is one of two major political parties in South Carolina and is the official representative entity of the Democratic National Committee in South Carolina. SCDP is responsible for, among other things, promulgating delegate selection rules for South Carolina for the 2024 Democratic National Convention. SCDP certifies to the State Election Commission the names of candidates to be placed on primary ballots.

Such certification must contain a statement that each candidate is a natural born citizen.

18.     Defendant South Carolina State Election Commission (the "Commission") is the state agency responsible for administering elections in South Carolina. S.C. Code Ann. § 7-3-10(F). The Commission is the final arbiter of, and has decision-making authority over, the final list of candidates submitted by SCDP for inclusion on the ballot. The Commission claims that it "helps uphold democracy by ensuring the election process is fair, impartial and easily accessible for everyone in our state." The Commission's self-proclaimed mission statement is to "ensure every eligible citizen has the opportunity to register to vote and participate in fair and impartial elections with the assurance that every vote will count." The Commission is a "program or activity" within meaning of the Civil Rights Restoration Act of 1987, 42 U.S.C. § 2000d-4a, and a recipient of federal assistance within meaning of Title VI's implementing regulations, 34 C.F.R. § 100.13(i), to assist with various aspects of the State's electoral process.

19.     Defendant John Wells is the Chairman of the South Carolina State Election Commission and is being sued in his official capacity.

20.     Defendant Howard M. Knapp is the Executive Director of the South Carolina State Election Commission and is being sued in his official capacity. Defendant Knapp is the chief administrative officer for the State Election Commission and is responsible for directing and supervising the implementation of the standardized processes established by the Commission. S.C. Code Ann. § 7-3-20(A). Defendant Knapp is also responsible for ensuring statewide "compliance with applicable state or federal law or State Election Commission policies and procedures with regard to the conduct of elections." *Id.* § 7-3-20(D)(2).

21.     Defendants, through their respective duties and obligations, are responsible for enforcing and applying the State's Ballot Access Statute and/or Delegate Selection Plan. Each

Defendant, and those subject to their direction, supervision, and control, has or intentionally will perform, participate in, aide and/or abet in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure Plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant, as well as all persons under their supervision, direction, or control, including but not limited to their officers, employees, and agents.

## FACTUAL BACKGROUND

22.    Plaintiff Cenk Uygur is a Turkish-born, naturalized American citizen.

23.    Mr. Uygur satisfies all the constitutional requirements for holding the Office of the President of the United States, except for the natural born citizenship requirement.

24.    In October 2023, Mr. Uygur announced his candidacy for President of the United States on The Young Turks YouTube channel and on his website, www.cenkforamerica.com.

25.    Since announcing his candidacy, Mr. Uygur has given speeches and participated in numerous interviews, including in Charleston, South Carolina, and has been covered by both print and broadcast media. Mr. Uygur's presidential candidacy and campaign have also been covered widely on the internet by numerous channels.

26.    Mr. Uygur has not hidden the fact that he is a naturalized citizen. Instead, he has made this fact a focal point of his campaign and been vocal about his belief that the Natural Born Citizen Clause is unlawful.

27.    In furtherance of his candidacy, Mr. Uygur has paid annual registration fees for his presidential website domain names and monthly fees to host and operate his presidential website. Mr. Uygur has also paid fees for a nationwide advertising campaign that links to his presidential website. All told, Mr. Uygur has expended significant time, effort, and resources in developing

the website's content and design.

28.    In 2024, South Carolina will be among the first states in the nation to hold a presidential primary.  Accordingly, Mr. Uygur and his campaign made the State's ballot application process a priority.

29.    South Carolina law regulates how party conventions or party primary elections held by political parties must be conducted in the State.  S.C. Code Ann. § 7-11-20(A).

30.    In particular, South Carolina's Ballot Access Statute requires that "political parties must verify the qualifications of candidates prior to certifying to the State Election Commission the names of candidates to be placed in primary ballots."  S.C. Code Ann." § 7-11-20(B)(2).  The Statute further mandates that "[p]olitical parties must not certify any candidate who does not or will not by the time of the general election meet the qualifications in the United States Constitution . . . and party rules for the presidential preference primary for which the candidate desires to file, and such candidate's name must not be placed on a primary ballot."  *Id.*

31.    The "party rules," as stated  in the Delegate Selection Plan, likewise provide, among other things, that "[p]ursuant to Section 7-11-20(B)(2) of the Code of Laws of South Carolina, a candidate seeking the nomination of the Democratic Party for President of the United States will be certified by the S.C. Democratic Party to the State Election Commission as a candidate for the Democratic presidential primary."  Plan at 15.  The Plan further dictates that "no one may gain access to the South Carolina Democratic ballot unless he or she . . . is legally qualified to hold the office of President of the United States, and is entitled to obtain delegates."  *Id.*

32.    Believing that the Natural Born Citizen Clause has been explicitly or implicitly repealed by later amendments to the U.S. Constitution and was otherwise unlawful, Mr. Uygur filed a Presidential Notice of Candidacy and Pledge with the SCDP on November 6, 2023, along

-8-

with the required $20,000 application fee.  SCDP accepted and cashed the check for $20,000.

33.    On November 13, 2023, the SCDP issued a press release containing the names of the candidates granted ballot access.

34.    The press release stated that "[p]er state law, SCDP Chair Christale Span will transmit the approved candidates to the South Carolina Election Commission: (i) President Joe Biden; (ii) Congressman Dean Phillips; and (iii) Marianne Williamson.

35.    With respect to Mr. Uygur, however, the press release read: "Cenk Uygur — Doesn't meet constitutional requirement to hold the office of President of the United States."

36.    Despite this determination, the SCDP did not return Mr. Uygur's $20,000 application fee.

37.    The SCDP did not otherwise dispute Mr. Uygur's qualifications to be on the primary ballot.

38.    Defendants' decision to omit Mr. Uygur's name on the Presidential Preference Primary ballot acts as a de facto deprivation of access to the General Presidential election process because forty-seven out of fifty states have enacted what are known as "Sore Loser Laws."  These laws prevent a losing candidate in a party primary election from subsequently filing to run as a listed candidate in the general election as the nominee of another party or as an independent candidate.  As Mr. Uygur has already been accepted on the ballot in other states, he could no longer run an effective Independent candidate campaign.  Accordingly, by denying Mr. Uygur access to the primary ballot, the SCDP has effectively precluded Mr. Uygur from receiving any votes, at any time, from any resident of South Carolina.

39.    Unless Defendants are enjoined from enforcing and applying South Carolina's Ballot Access Statute and the Plan, Plaintiffs will suffer continuing and irreparable harm.

<u>COUNT I</u>
<u>NATIONAL ORIGIN DISCRIMINATION IN U.S. CONST. ART. II § 1, CL. 5</u>
<u>IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS AND</u>
<u>42 U.S.C. § 1983</u>
**(Explicit Repeal Challenge)**

40.    Plaintiffs repeat and reallege the allegations in the previous paragraphs of this Complaint as if fully alleged herein.

41.    The Fourteenth Amendment to the U.S. Constitution provides as follows, in relevant:

> **<u>All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States</u>** and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

(Emphases added).

42.    The Fifth Amendment likewise echoes the due process protections referenced in the Fourteenth Amendment, confirming that the government may not deprive a person of "life, liberty, or property without due process of law."

43.    The explicit and limited use of the word "born" throughout the Constitution further compels the conclusion that the Natural Born Citizen Clause was explicitly repealed by the Fourteenth Amendment.

44.    The word "born" appears only twice in the original Constitution and its amendments; the first is in the Natural Born Citizen Clause, and the second is in the Fourteenth Amendment's Citizenship Clause.

45.    The other explicit language in the Fourteenth Amendment to the U.S. Constitution, with its clear articulation of citizenship, due process, and equal protection for all persons fundamentally altered the constitutional landscape.  Together, these provisions explicitly repealed

the language in the Natural Born Citizen Clause by extending citizenship rights universally, without the national origin-based distinction present in Article II.

46.    The Privileges and Immunities Clause of the Fourteenth Amendment likewise broadened the understanding of citizenship beyond the framers' intent in the original Constitution by defining and conferring citizenship in a more inclusive and comprehensive way.  When read in concert with the other provisions of the Fourteenth Amendment and the Constitution as a whole, the Privileges and Immunities Clause operates to guarantee that fundamental rights of citizenship cannot be abridged by the government.

47.    Delving into the historical context, the intent behind the Fourteenth Amendment was to expand rights and address inequalities, particularly in the wake of the Civil War.  This expansion of rights is best interpreted as a movement towards inclusivity in citizenship and civil rights, which contrasts with the exclusive and discriminatory nature of the natural born citizenship requirement.

48.    Examination of the Congressional debates and history surrounding the ratification of these amendments also reveals a clear intent to redefine and expand the understanding of citizenship rights within the United States.  This expansion is at odds with the restrictive and discriminatory nature of the Natural Born Citizen Clause.

49.    The broader constitutional context also demonstrates that the Fourteenth Amendments explicitly repealed the Natural Born Citizen Clause.  This amendment was not added in isolation but as part of a broader constitutional framework.  Its integration into this framework compels a re-evaluation and modification of earlier provisions that conflict with the newer amendment's principles.

50.    The core principles of the Constitution, as expanded and clarified by the Fourteenth

Amendment, emphasize equality, non-discrimination, and the protection of individual rights.

51.    The Natural Born Citizen Clause, by contrast, created a distinct, second class of citizenship that is anathema to the evolved constitutional principles articulated in the Fourteenth Amendment.

52.    In sum, the textual clarity, legislative intent, constitutional context, and consistency with constitutional principles compels the conclusion that the Natural Born Citizen Clause was explicitly repealed by the Fourteenth Amendment.

### COUNT II
### NATIONAL ORIGIN DISCRIMINATION IN U.S. CONST. ART. II § 1, CL. 5
### IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS AND
### 42 U.S.C. § 1983
### (Implicit Repeal Challenge)

53.    Plaintiffs repeat and reallege the allegations in the previous paragraphs of this Complaint as if fully alleged herein.

54.    Even if the Natural Born Citizen Clause was not explicitly repealed, it has been repealed by implication.

55.    The Fifth and Fourteenth Amendments, through their articulation of universal due process and equal protection rights, shifted the constitutional landscape.

56.    The broad language used in the Due Process, Citizenship, Privileges and Immunities, and Equal Protection Clauses are best interpreted as contradicting and implicitly overriding the more exclusive Natural Born Citizen Clause.

57.    This interpretation is the unavoidable implication of the Fourteenth Amendment's express statement that citizenship, in the context of rights and protections, is a uniform category, not one bifurcated into natural born and naturalized distinctions.

58.    The historical context and legislative intent behind the Fourteenth Amendment

focused on expanding and universalizing rights, particularly in response to civil rights concerns.

59.     Delving into the Congressional debates and ratification history reveals an overarching goal to create a more inclusive Constitution.

60.     This goal, even if not explicitly stated as intending to repeal the Natural Born Citizen Clause, is in irreconcilable conflict with any clause that creates inherent legal distinctions based on the circumstances of one's birth.

61.     The broader constitutional context likewise compels implicit repeal.

62.     The post-Civil War amendments (including the Fourteenth) were meant to fundamentally redefine the American legal and social landscape. This redefinition, centered around rectifying historical inequalities, implying a move away from constitutional provisions that foster inherent inequality — such as the natural-born citizen requirement.

63.     The core principles of the Constitution have evolved to emphasize equality and nondiscrimination.  The Natural Born Citizen Clause, by contrast, created a distinct class of citizens who are eligible for the presidency, and is in irreconcilable tension with these more modern principles articulated in the Fourteenth Amendment.

64.     Deeming the Natural Born Citizen Clause to be implicitly repealed is of necessity for the Constitution to remain internally consistent, particularly in its fundamental principles.

65.     The judicial review principle of strict scrutiny, particularly as it applies to laws affecting protected classes (such as national origin), further supports implicit repeal.

66.     This relatively modern standard, which did not exist at the Nation's founding, provides a framework for interpreting the Constitution in a way that favors broad protections against discrimination. Given that the natural-born citizen clause creates a distinction based on national origin, the application of strict scrutiny in modern constitutional interpretation supports

implicit repeal, as the natural-born citizenship clause could not withstand this level of judicial scrutiny.

67.     In sum, implicit repeal of the Natural Born Citizen Clause by the Fourteenth Amendment is evidenced by (i) the breadth and scope of the language used in the Fifth and Fourteenth Amendments, (ii) historical context, (iii) legislative intent, (iv) the broader constitutional context, (v) the demand for internal constitutional consistency, and (vi) the advent of judicial review standards that favor broad protections against discrimination.

**COUNT III**
**FIRST AMENDMENT CHALLENGE UNDER 42 U.S.C. 1983 TO**
**S.C. CODE ANN. § 7-11-20 AND DELEGATE SELECTION PLAN**

68.     Plaintiffs repeats and realleges the allegations in the previous paragraphs of this Complaint as if fully alleged herein.

69.     The First Amendment to the U.S. Constitution protects freedom of speech and rights of association.

70.     South Carolina's Ballot Access Statute—described above and codified at S.C. Code Ann. § 7-11-20, together with the SCDP's Delegate Selection Plan—violates Plaintiffs' right to free speech and association, as guaranteed by the First Amendment to the U.S. Constitution, irrespective of whether the Constitution does or does not permit him to hold the office of President.

71.     The Natural Born Citizenship Clause found in Art. II § 1, cl. 5 of the U.S. Constitution, even if not repealed, does not on its face speak to qualifications for candidacy; it speaks to qualifications for *service*.

72.     ***Self-Expression.*** The requirement in the Ballot Access Statute and Delegate Selection Plan that Mr. Uygur be a natural born citizen in order to appear on the ballot denies him a critical platform to express his ideas and policy positions.  Being on the ballot is not just about

seeking office; it is about the opportunity to participate in the marketplace of ideas, a core principle of the First Amendment.

73.    ***Public Debate.*** The Ballot Access Statute and Delegate Selection Plan also violate Plaintiffs' First Amendment Rights by limiting the diversity of viewpoints in the public debate, a key component of a healthy democratic process.

74.    ***Freedom of Association – Supporter Engagement.*** The Ballot Access Statute and Delegate Selection Plan deprive supporters like Mr. Ward of the opportunity to rally around their preferred candidate.  This undermines the collective aspect of political participation, as the right to association includes the right to come together to advance common beliefs.

75.    ***Freedom of Association – Political Advocacy.*** The Ballot Access Statute and Delegate Selection Plan restrict the ability of Mr. Uygur and his supporters to engage in political advocacy, a form of expressive association protected by the First Amendment.

76.    By refusing to place Mr. Uygur's name on the ballot, Defendants have effectively limited the choices available to voters.  This restriction contravenes First Amendment principles and diminishes the democratic process, where a variety of candidates and ideas should be available for voter consideration.

77.    When a fundamental First Amendment right is subject to severe restriction, the regulation must be narrowly tailored to further a compelling state interest.

78.    The Ballot Access Statute and Delegate Selection Plan are not narrowly tailored.

79.    Any government interest purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could be advanced equally effectively by any number of less-restrictive alternatives—including, but not limited to:

    a.    ***Existing Non-Discriminatory Ballot Requirements***: Relying on the other existing

provisions in the Ballot Access Statute and Delegate Selection Plan that do not abridge constitutionally protected rights. *See, e.g.*, S.C. Code Ann. § 7-11-20(B)(2); Plan at 15.

b. ***Disclaimer on Ballots***: Including a clear, concise disclaimer on the ballot next to the name of any candidate who is not a natural born citizen. This would alert voters to the potential ineligibility of the candidate without barring their participation and abridging First Amendment rights.

c. ***Educational Campaigns***: The State, Commission, or SCDP could conduct educational campaigns through various media platforms, explaining the constitutional requirements for presidential eligibility. This would inform the public without targeting any specific candidate.

d. ***Candidate Declarations***: Requiring candidates to declare their eligibility status when filing for candidacy. This declaration could be made public through the Commission's and/or SCDP's website and other public notices, ensuring transparency.

e. ***Voter Guides***: Including information about the constitutional requirements for presidency in voter guides distributed before elections. Specific notes could be made next to candidates who do not meet these criteria.

f. ***Public Forums and Debates***: The State, Commission, or SCDP could facilitate or encourage discussions and debates, during which a moderator would be allowed to mention the eligibility requirements, providing an opportunity for candidates to address their eligibility status directly to voters.

g. ***Digital Notifications***: Utilizing digital platforms like election websites or voting

apps to provide notifications about the eligibility of candidates. Voters could access this information easily when researching candidates.

h. ***Partnerships with News Outlets & Social Media Platforms***: Working with local and national news outlets and social media platforms to ensure they have accurate information about a candidate's eligibility to serve, which can be included in their election coverage. The proliferation of news outlets like CNN, Fox, ABC, and the expansive reach of social media are sufficient channels to inform voters. These platforms provide real-time updates and fact checking services, enabling voters to receive timely and accurate information about a candidate's eligibility and policy positions.

i. ***Direct Mailings to Voters***: Sending information directly to voters' homes about the eligibility requirements for presidential candidates, possibly including information about the specific candidates on the ballot.

j. ***Community Outreach Programs***: Engaging in community outreach programs, especially in areas with lower voter education, to inform voters about the natural born citizen requirement.

k. ***QR Codes on Ballots***: Implementing QR codes on ballots that voters could scan to get immediate information about each candidate's eligibility status.

80.     Any of these less-restrictive alternatives avoids the constitutionally dubious practice of allowing the government to discriminate based on national origin. Instead, the proposed methods focus on increasing voter awareness and education without infringing on the rights of candidates and voters to participate in the electoral process, thus aligning with the text and spirit of the First Amendment.

81.    Upon information and belief, Defendants have no evidence of any harm that has ever befallen the public due to the State allowing a naturalized citizen on the primary ballot.

82.    Upon information and belief, South Carolina has no evidence that its election machinery would be clogged if Mr. Uygur were permitted to appear on the ballot.

83.    Upon information and belief, Defendants have no evidence of any voter confusion that would result if Mr. Uygur were permitted to appear on the ballot.

84.    Upon information and belief, South Carolina has no evidence that it would incur any additional expense or burden if Mr. Uygur were permitted to appear on the ballot.

85.    Other states, such as Texas and Vermont, have permitted naturalized citizens (including Mr. Uygur) to appear on the primary ballot without any disclaimer at all.

86.    Numerous other states, such as Connecticut, Delaware, Minnesota, Nebraska, New Jersey, New York, and Vermont have all granted naturalized citizens ballot access in the past.

87.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by *Existing Non-Discriminatory Ballot Requirements.*

88.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by a *Disclaimer on Ballots.*

89.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by *Educational Campaigns.*

90.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be

advanced equally well by *Candidate Declarations.*

91.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by *Voter Guides.*

92.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by *Public Forums and Debates.*

93.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by *Digital Notifications.*

94.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by *Partnerships with News Outlets and Social Media Platforms.*

95.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by *Direct Mailings to Voters.*

96.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan Statute could not be advanced equally well by *Community Outreach Programs.*

97.    Upon information and belief, Defendants possess no evidence that any interests purportedly advanced by the Ballot Access Statute and Delegate Selection Plan could not be advanced equally well by *QR Codes on Ballots.*

98.    Plaintiffs have no ample alternative channels of communication and association.

99.     Being a write-in candidate is not an ample alternative channel of communication and association.

100.     Write in candidates suffer from a lack of visibility compared to those on the ballot.

101.     Voters are less likely to be aware of write-in options or specific write-in candidates, thereby abridging their constitutional right to receive information and ideas and limiting the speech available to them.

102.     Educating voters about a write in campaign is significantly more costly and challenging, effectively limiting Mr. Uygur's freedom of speech and the voters' ability to receive information.

103.     Upon information and belief, Mr. Uygur would be perceived as less legitimate or serious, which would negatively impact voter behavior and undermine the democratic process.

104.     Defendants are impairing voters' ability to express their political preferences by limiting the choices available to voters on the ballot.

105.      Unless Defendants are enjoined from enforcing and applying the Ballot Access Statute and Delegate Selection Plan, Plaintiffs will suffer continuing and irreparable harm under the First Amendment.

**COUNT IV**
**FIFTH AND FOURTEENTH AMENDMENT CHALLENGE UNDER**
**42 U.S.C. § 1983 TO S.C. CODE ANN. § 7-11-20 AND DELEGATE SELECTION PLAN**
**(Due Process, Equal Protection, and Privileges and Immunities)**

106.     Mr. Uygur repeats and realleges the allegations in the previous paragraphs of this Complaint as if fully alleged herein.

107.     The Fifth and Fourteenth Amendments to the U.S. Constitution ensure Mr. Uygur due process and equal protection under the law.

108.     South Carolina's Ballot Access Statute—described above and codified at S.C. Code

Ann. § 7-11-20, together with the SCDP's Delegate Selection Rules—violates Mr. Uygur's due process and equal protection rights.

109.    The Due Process Clause of the Fifth Amendment and Fourteenth Amendments provides that the government may not deprive a person of "life, liberty, or property without due process of law."

110.    The Ballot Access Statute and Delegate Selection Plan arbitrarily and unreasonably denies Mr. Uygur the fundamental political right to appear on the ballot on the basis of national origin.

111.    The Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the law."

112.    The Ballot Access Statute and Delegate Selection Plan create two classifications of citizens: natural born citizens and foreign-born, naturalized citizens.

113.    The Ballot Access Statute and Delegate Selection Plan allow for discrimination in ballot access based upon the national origin of the candidate.

114.    Such unequal treatment of persons contravenes the rights guaranteed by the Equal Protection and Privileges and Immunities Clauses of the Fourteenth Amendment.

115.    The Fourteenth Amendment requires South Carolina to treat all similarly situated persons alike.

116.    The Supreme Court has held that citizenship obtained through naturalization is not second-class citizenship.

117.    Naturalized and natural-born citizens of the United States are persons similarly situated under the Constitution and should be treated alike.

118.    Unless Defendants are enjoined from enforcing and applying South Carolina's

Ballot Access Statute and the Delegate Selection Plan, Mr. Uygur will suffer continuing and irreparable harm under the Fifth and Fourteenth Amendments.

<u>**COUNT V**</u>
**NATIONAL ORIGIN DISCRIMINATION IN S.C. CODE ANN. § 7-11-20**
**IN VIOLATION OF TITLE VI**

119.    Mr. Uygur repeats and realleges the allegations in the previous paragraphs of this Complaint as if fully alleged herein.

120.    Title VI, 42 U.S.C. § 2000d *et seq.*, which was enacted as part of the Civil Rights Act of 1964, prohibits the exclusion of individuals from participation in or from the denial of benefits from a federally funded program or activity on the grounds of race, color, or national origin.

121.    South Carolina and the South Carolina State Election Commission constitute a "program or activity" within meaning of the Civil Rights Restoration Act of 1987, 42 U.S.C. § 2000d-4a, and are recipients of federal assistance within meaning of Title VI's implementing regulations, 34 C.F.R. § 100.13(i), to assist with various aspects of the State's electoral process.

122.    South Carolina, through its Secretary of State, applied for and received federal assistance under the Help America Vote Act ("HAVA").

123.    South Carolina's Secretary of State is the only entity in the state eligible to apply to the U.S. Election Assistance Commission for HAVA funds.  Funds are then awarded to state agencies in South Carolina. States may then re-grant/distribute funds to local election districts/offices at their discretion.

124.    The fiscal year 2023 allocation to South Carolina under HAVA was $1,084,886.

125.    Upon information and belief, these funds were distributed to the South Carolina State Election Commission.

126.    Upon Information and belief, South Carolina also received $6.8 million in HAVA funds under the terms of the fiscal year 2020 budget deal.

127.    By refusing to include Mr. Uygur's name on the primary ballot based on his national origin, South Carolina's Ballot Access Statute, S.C. Code Ann. § 7-11-20, denies Mr. Uygur the benefits of HAVA funds given to South Carolina and the South Carolina State Election Commission.

128.    Defendants' implementation, applications, and enforcement of the South Carolina Ballot Statute violates Title VI.

129.    Defendants' violation of Title VI directly and proximately caused damage to Mr. Uygur.

130.    Unless Defendants are enjoined from enforcing and applying South Carolina's Ballot Access Statute, Mr. Uygur will suffer continuing and irreparable harm under Title VI.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs respectfully requests that the Court:

1. Enter a declaratory judgment that the Natural Born Citizen Clause has been nullified and repealed by the Fifth and Fourteenth Amendments to the United States Constitution;

2. Enter a declaratory judgment that South Carolina's Ballot Access Statute, S.C. Code Ann. § 7-11-20, and the Delegate Selection Plan violate rights guaranteed to the Plaintiffs by the First, Fifth, and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983;

3. Enter a declaratory judgment that South Carolina's Ballot Access Statute, S.C. Code Ann. § 7-11-20, and the Delegate Selection Plan violate Title VI, 42 U.S.C. § 2000d *et seq.* of the Civil Rights Act of 1964;

4. Enter an *ex parte* temporary restraining order enjoining Defendants from applying and enforcing South Carolina's Ballot Access Statute, S.C. Code Ann. § 7-11-20, and the Delegate Selection Plan, to the extent they disqualify naturalized American citizens from having their names included on the primary ballot;

5. Enter a preliminary injunction enjoining Defendants from applying and enforcing South Carolina's Ballot Access Statute, S.C. Code Ann. § 7-11-20, and the Delegate Selection Plan, to the extent they disqualify naturalized American citizens from having their names included on the primary ballot;

6. Permanently enjoin Defendants from applying and enforcing South Carolina's Ballot Access Statute, S.C. Code Ann. § 7-11-20, and the Delegate Selection Plan, to the extent they disqualify naturalized American citizens from having their name included on the primary ballot;

7. Enter an *ex parte* temporary restraining order enjoining Defendants from failing to take all steps necessary to place Mr. Uygur's name on the ballot for the February 2024 Presidential Preference Primary;

8. Enter a preliminary injunction enjoining Defendants from failing to take all steps necessary to place Mr. Uygur's name on the ballot for the February 2024 Presidential Preference Primary;

9. Award Plaintiffs nominal damages;

10. Award Plaintiffs the cost of this action together with their reasonable attorneys' fees pursuant to 42 U.SC. § 1988; and,

11. Retain jurisdiction of this action and grant Plaintiffs any further relief which may in the discretion of this Court be necessary and proper.

Dated: December 22, 2023

**FOSTER GARVEY PC**

Brad C. Deutsch*
Dwayne D. Sam*
3000 K St NW, Ste 420
Washington, DC 20007
T: 202.298.1793
E: brad.deutsch@foster.com
E: dwayne.sam@foster.com

Malcolm Seymour, III*
Jeanne Barenholtz*
100 Wall St, 20th Fl
New York, NY 10005
T: 212.431.8700
E: malcolm.seymour@foster.com
E: Jeanne.Barenholtz@foster.com


Julia Doherty*
1111 Third Ave, Ste 3000
Seattle, WA 98101
T: 206.447.2917
E: Julia.doherty@foster.com

*Counsel for Plaintiff*
*Pro Hac Vice Applications Forthcoming

Respectfully submitted,

**HARRIS & GASSER, LLC**

/s/ Gregory P. Harris
Gregory P. Harris (#1739)
Historic District
1529 Laurel Street
Columbia, SC 29201
T: 803.779.7080
E: greg@harrisgasserlaw.com


*Local Counsel for Plaintiff*