UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| CENK UYGUR and JOHN WARD<br><br>　　　　Plaintiffs,<br>　v.<br><br>SOUTH CAROLINA; HENRY MCMASTER, in his official capacity as Governor of South Carolina; ALAN WILSON, in his official capacity as Attorney General of South Carolina; SOUTH CAROLINA DEMOCRATIC PARTY; SOUTH CAROLINA STATE ELECTION COMMISSION, JOHN WELLS, and HOWARD M. KNAPP, in their official capacities as Chairman and Executive Director, respectively, of the South Carolina State Election Commission,<br><br>　　　　Defendants. | Case No. 3:23-6879-JFA |

**DEFENDANT SOUTH CAROLINA DEMOCRATIC PARTY'S MOTION TO DISMISS & OPPOSITION TO PLAINTIFFS' MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

　　The South Carolina Democratic Party ("SCDP") has a long-recognized First Amendment association right to limit its primary candidates, especially in its own Presidential Primary Preference ("PPP") contest, to only those candidates certified as such according to SCDP's own rules set forth in the SCDP Delegate Selection Plan ("SCDP Plan").

　　Defendant SCDP has lawfully exercised its First Amendment Rights and has chosen not to have Plaintiff Uygur appear on its PPP. There is absolutely nothing unconstitutional or unreasonable about this lawful exercise of SCDP's First Amendment right of association.

Plaintiffs' Complaint For Declaratory Relief must be dismissed pursuant to FRCP 12(b)(1) and 12(b)(6) and Motion For Injunctive Relief denied.

## PROCEDURAL SUMMARY

Defendant SCDP was "served" with this action on January 2, 2024 when an envelope containing the documents filed in ECF 1 and 2 were delivered to the SCDP office. (See Exhibit A – Parmley Affidavit). The SCDP office was closed for the holidays until that day. SCDP was unaware, and was not thereafter served, with either the Motion to Expedite filed that same day, (ECF 19) nor the text Order of this Court granting same on January 3, 2024 (ECF 31) establishing an expedited briefing schedule and hearing.

As such, Defendant SCDP:

a. With the consent of Plaintiffs, has contemporaneously filed a Motion for Extension of Time to File this opposition in accord with USDC Local Rule 6.01 which was subsequently granted by the Court this afternoon;

b. Adopts and incorporates by reference the motions, opposition briefing, and arguments of Defendants Henry McMaster (ECF No. 42, 47), Defendant Alan Wilson (ECF No. 39, 50), and Defendant South Carolina Election Commission (ECF No. 40, 41, 52); and

c. Asks the Court to indulge errors in citation, formatting, and the somewhat limited presentation of arguments set forth herein given the time constraints placed upon counsel for SCDP as counsel was only retained yesterday.

# FACTUAL BACKGROUND

1. Plaintiff Cenk Uygur ("Uygur") is an admitted Turkish-born, naturalized American citizen. ECF No. 1 at 3, ¶ 10. Plaintiff was born to foreign born parents on foreign soil. *Id.*

2. Plaintiff John Ward is a United States citizen and resident of South Carolina. *Id.* ¶ 12. He is a registered voter and stated he would like to have the opportunity to vote for Mr. Uygur in the Democratic Presidential Preference Primary ("PPP") on February 3, 2024. *Id.*

3. On November 6, 2023, Uygur filed a Presidential Notice of Candidacy and Pledge ("Notice") with the South Carolina Democratic Party with the intention of appearing on the SCDP Democratic PPP ballot. *Id.* at 8-9, ¶ 32. (ECF 2-1). That Notice specifically states that the Candidate acknowledges that a vote of the State Party Executive Council will determine which candidates will be certified. *Id.*

4. The South Carolina Democratic PPP is governed by both South Carolina law and the SCDP Delegate Selection Plan ("SCDP Plan") (ECF 2-2). The purpose of the SCDP Plan is two-fold: (1) ensure the process complies with State law; and (2) ensure that only qualified Democratic Presidential candidates, as determined by the SCDP Executive Council, are permitted access to the South Carolina Democratic PPP ballot.[1]

---

[1] The South Carolina Democratic Presidential candidates on the PPP ballot will receive votes in the PPP and thereafter be awarded and allocated South Carolina's 65 delegates on the basis of the results of that PPP vote. The entire Democratic National Committee delegate rules, voting, totals, and complete process is available here: https://democrats.org/2024-delegate-selection-process/

5. Specifically, The SCDP Plan provides as follows:

> Pursuant to Section 7-11-20 (8) (2) of the Code of Laws of South Carolina, a candidate seeking the nomination of the Democratic Party for President of the United States will be certified by the S.C. Democratic Party to the State Election Commission as a candidate for the Democratic presidential primary. A vote of the State Party Executive Council will determine which candidates will be certified. The Executive Council will only vote to certify those candidates who are *bona fide* Democrats, whose record demonstrates their faithfulness to the Democratic Party, who are generally acknowledged or recognized in news media throughout the United States as viable candidates for that office, who are actively campaigning for the South Carolina Democratic presidential primary, who voted in their own states' most recent Democratic primary, and who are taking demonstrable steps to qualify for the delegate selection process in more than 6 states. The burden of proof is upon the candidate to provide said information by 12 noon on Friday, November 10, 2023.
>
> Only those candidates about whom such determination is made by the Executive Council shall be deemed to meet the qualifications of party rules under and for purposes of Section 7-11-20 (8) (2) of the Code of Laws. Additionally, no one may gain access to the South Carolina Democratic ballot unless he or she is a registered voter, is legally qualified to hold the office of President of the United States, and is entitled to obtain delegates.
>
> The Executive Council will meet at 6 pm on Monday, November 13, to certify candidates for the presidential primary ballot. The State Chair will transmit the candidates to the State Election Commission on November 14.

6. The SCDP Plan required Plaintiff Uygur, as of 12 noon on Friday, November 10, 2023, who bore the burden of proof, to prove those conditions set forth in the SCDP Plan to the Executive Council, including but not limited to, identifying the demonstrable steps being taken by him to qualify for the delegate selection process in more than six (6) other states. *Id.*

7. Plaintiff Uygur did not submit any documentation of any kind to SCDP on or before the deadline showing steps taken by him to qualify for the delegate selection process in more than six (6) other states. (Exhibit A – Parmley Affidavit at ¶ 9).

8. The three (3) certified candidates did submit this documentation. *Id.* at ¶ 10.

9. Referenced in the SCDP Plan is also S.C. Code Ann. § 7-11-20 (B)(2) ("Ballot Access Statute" or the "Statute"), that provides:

Political parties must verify the qualifications of candidates prior to certifying to the State Election Commission the names of candidates to be placed on primary ballots. The written certification required by this section must contain a statement that each certified candidate meets, or will meet by the time of the general election, or as otherwise required by law, <u>the qualifications in the United States Constitution, statutory law,</u> **and party rules** [SCDP Plan] to participate in the presidential preference primary for which he has filed. (emphasis added).

10. SCDP thereafter conferred with counsel regarding the state of the law and Plaintiff Uygur's legal qualifications to hold the Office of President of the United States. *Id.* at ¶ 11.

11. The SCDP Executive Council met, received the advice of counsel, and pursuant to the SCDP Plan, voted to certify three (3) Democratic PPP candidates and not to certify Plaintiff Uygur. (Exhibit A - Parmley Affidavit at ¶ 12)

12. Thereafter, the SCDP issued a Press Release announcing these 3 certified candidates and referencing the SCDP Plan stated: "Cenk Uygur – Doesn't meet the constitutional requirement<u> to hold the office of the President of the United States</u>." (ECF 2-5)(emphasis added).[2]

13. Plaintiff Uygur has pled that he does not satisfy all the requirements to hold the Office of President of the United States. (ECF 1 Complaint at ¶ 23):

> 23. Mr. Uygur satisfies all the constitutional requirements for holding the Office of the President of the United States, except for the natural born citizenship requirement.

14. At the time the SCDP Executive Council made its decision not to certify Plaintiff Uygur, there existed no binding legal precedent of any kind that declared that a naturalized citizen

---

[2] That Press Release did not mention the absence of the required submissions of Plaintiff Uygur related to other state ballot access by the November 10 Noon deadline. The absence of these submissions was a separate and independent basis that would have prevented certification of his candidacy by the SCDP Executive Council. (Exhibit A – Parmley Affidavit at ¶14).

such as Plaintiff Uygur was "legally qualified to hold the office of the President of the United States."[3]

15. At the time the SCDP Executive Council made its decision not to certify Plaintiff Uygur, there existed legal precedent that declared that a naturalized citizen such as Plaintiff Uygur was not "legally qualified to hold the office of the President of the United States."

16. Plaintiff Uygur himself has recognized the absence of any binding precedent in the filing of this action and has filed this Declaratory Judgment Action per 28 U.S.C. §§2201 and 2202 declaring a controversy exists as to his status as a naturalized citizen, the Natural Born Citizen Clause, and his ability to hold the office of the President seeking Declaratory Relief. (ECF 1 ¶ 7).

## ARGUMENT

**A. Since Plaintiffs' Claims Only Involve Access to a Presidential Preference Primary ("PPP") and Not a General Election Ballot, No Fundamental Rights of Plaintiff Uygur are Implicated.**

Plaintiff Uygur has not been denied access to a general election ballot and the finality of the general election related thereto. Plaintiff Uygur has only been denied the ability to appear on the South Carolina Democratic Presidential Preference Primary ballot pursuant to the SCDP's rules and its own determination for qualifications to participate in its own PPP.

Under the United States Constitution, states retain the power to regulate their own elections. U.S. Const. Art. I, § 4; *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). State election regulations inevitably impose some burdens on individuals' rights to vote and to associate with others for political purposes. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

---

[3] See FRE 201(b)(2) **Kinds of Facts That May Be Judicially Noticed**. The court may judicially notice a fact that is not subject to reasonable dispute because it…(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

As a result, courts do not broadly subject election regulations to strict scrutiny; doing so "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Instead, courts tailor the level of scrutiny applied to each case according to the particular details of the private rights and government interests that are implicated:

> [A] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interest put forward by the state as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's right. *Id*. at 434.

When state law subjects First and Fourteenth Amendment rights to "severe" restrictions, courts apply strict scrutiny. *Id.* But when the law only imposes restrictions on constitutional rights that are reasonable and nondiscriminatory, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*

1. **The Burden on Plaintiffs' Putative Rights are *de mininis* at Best.**

In this case, the balancing test described above tilts overwhelmingly in favor of a limited standard of review, because there is no clear legal basis for Uygur's assertions that he possesses constitutional rights that are relevant to this case at all. Uygur cites no case law holding either that (1) an individual has a First or Fourteenth Amendment right to run in a partisan presidential nomination primary or (2) a voter has a First or Fourteenth Amendment right to vote for a particular candidate in such a primary.

Indeed, federal courts have held that such alleged rights are "considerably attenuated and possibly nonexistent." *Duke v. Massey*, 87 F.3d 1226, 1233 (11th Cir. 1996) ("Duke III"); see also id. at 1232-33 (holding that candidate "does not have a First Amendment right to express his beliefs as a presidential candidate for the Republican Party"); *Duke v. Cleland*, 954 F.2d 1526,

1530-31 & n. 6 (11th Cir. 1992) ("Duke I") (rejecting candidate's allegation that "he has a right to associate with an 'unwilling partner,' the Republican Party," and holding that "[i]ndeed a strong argument could be made that there is no right to vote for any particular candidate in a party primary, because the party has the right to select its candidates").

As such, there are no fundamental rights of Plaintiff Uygur at issue. See *Belluso v. Poythress*, 485 F. Supp. 904 (1980) where a candidate was denied access to the Georgia Republican PPP. The *Belluso* Court stated:

> We adopt the *Lubin v. Panish* rule as a general statement of relevant equal protection analysis. According to that decision, the right to appear on a general election ballot is constitutionally favored but less than fundamental…
>
> The critical factual distinction between our case and the cases decided by the Supreme Court is that plaintiff Belluso **seeks inclusion in a preferential primary that has dubious effect as opposed to a general election that has finality**. (emphasis added). This distinction has several consequences. The first is that Belluso's exclusion from this particular ballot in no way bars him from running for President. Denied the chance to claim the Republican nomination, Belluso may nevertheless seek the Presidency in the general election independently or as the candidate of a smaller political party.

*Belluso* at 911-912.

See also, *Hero v. Lake County Election Board* 42 F.4th 768 (2022) where Hero, a Republican, was banned by and from the Indiana Republican Party for 10 years, and who thereafter during this "banned" period, tried to file to run as a Republican in a primary. *Id.* at 770. Hero met all the qualifications to run for the office he filed for. The Indiana Republican Party told the Lake County Election Board that Hero could not run as Republican in their primary given the ban. *Id.* at 771. Hero was removed from the Republican primary ballot and filed suit. The Court stated any restriction on Hero's primary ballot access was only a "minor restriction" of Hero's rights:

> The Election Board did not violate Hero's First and Fourteenth Amendment rights. The decision to strike Hero's name from the ballot imposed only a minor restriction on

his ballot access. Indiana law provides alternative means to access the general-election ballot. Although Hero cannot run in the Republican primary—undoubtedly his first choice—he can either run as an independent by obtaining two percent of the total vote cast in the last election or as a write-in candidate. Ind. Code §§ 3-8-2-2.5(a), 3-8-6-3(a).

*Hero* at 776.

**B. Since Plaintiffs' Claims Only Involves Access to a Presidential Preference Primary ("PPP") and Not a General Election Ballot; No Irreparable Harm Exists.**

Plaintiff Uygur claims *ipse dixit* that a constitutional violation has occurred (that has of yet to even be determined) and that an irreparable harm has befallen him because a constitutional violation has, in his opinion, occurred. ECF 2-1 p.18.

Plaintiff Uygur also mistakenly claims irreparable harm arguing that the failure of the SCDP to certify his candidacy will '*de facto* deprive him of access to the General Election given the existence of sore-loser laws.' *Id.* at 18-19.Fortuntaely for Uygur, this is incorrect.

South Carolina's "sore-loser" statute does not in fact bar or prevent Uygur from appearing on the South Carolina General Election Presidential Ballot as S.C. Code Ann. § 7-11-210 does not apply to Presidential candidates. Further, the statute only applies "to a person who was defeated as a candidate for nomination to an office in a party's primary election" and since Uygur will not have appeared on the Democratic PPP he is free to appear on the General Election ballot.

Lastly, Uygur further claims irreparable harm in that 'excluding him from the [PPP] ballot has "real-time implications for the efficacy of his campaign" despite not identifying the exact nature of these alleged real-time implications. ECF 2-1 p.18.

Given Uygur's General Election ballot access by other means, the actions of the SCDP in failing to certify Uygur for inclusion in its Democratic PPP doesn't change Uygur's ability to campaign one iota as was noted by the *Hero* Court:

As an independent, he can tout his Republican virtues, tell voters he supports Republicans, put up yard signs to that effect, and run on a platform identical to any political party. The only limitation is that he cannot appear on the Republican Party's primary ballot. *Hero* at 776.

This recognition of access to the general election ballot as curative of any right to being in a PPP was discussed in great detail in *De La Fuente v. Simon*, 940 N.W.2d 477 (Minn. 2020) *cert denied* 141 S.Ct. 1374 (2021).

In *De la Fuente*, Minnesota Code Section 207A.13 gives the Party absolute discretion to place or not place candidate names on its PPP ballot according to its own party Rules.[4] *Id.* at 483. De La Fuente was denied a place on the Republican PPP ballot by the Republican Party despite meeting the qualifications for Office of the President. *Id.* at 482. De La Fuente thereafter filed suit challenging the statute, process, and his denial as a candidate in the Republican PPP. The Republican Party argued that De La Fuente had no constitutional right to force the Republican Party of Minnesota to associate with him in violation of their First Amendment right of association. The Minnesota Supreme Court agreed and held that 207A.13 and this system for conducting the PPP did not deprive De La Fuente of any fundamental right stating:

> **In other words, different processes are needed for different avenues to the general-election ballot; but in the end, any presidential candidate who satisfies statutory requirements has access to the general-election ballot, regardless of the candidate's access to the presidential nomination primary ballot.** (emphasis added). *See* Minn. Stat. § 208.04, subd. 1 (requiring the general election ballot to include "the names of the candidates of each major political party and the candidates nominated by petition"); *see also LaRouche v. Sheehan*, 591 F. Supp. 917, 927 (D. Md. 1984) (rejecting an equal-protection challenge to a state law regulating access to a primary election ballot, because the statute applies only to major political parties who " 'use a primary election' as a device to nominate a candidate for president," and thus does not "freeze[ ] the status quo to the detriment of minority parties" (citation omitted)); *Belluso*, 485 F. Supp. at

---

[4] Candidates on the ballot. (a) Each party must determine which candidates are to be placed on the presidential nomination primary ballot for that party. The chair of each party must submit to the secretary of state the names of the candidates to appear on the ballot for that party no later than 63 days before the presidential nomination primary. Once submitted, changes must not be made to the candidates that will appear on the ballot.

912 ("Denied the chance to claim the Republican nomination, [a candidate] may nevertheless seek the Presidency in the general election independently or as the candidate of a smaller political party." (footnote omitted)). Thus, the distinction drawn in section 207A.13 is substantial and is reasonably related to the needs of a specific class of political parties, those whose presidential candidates for the general election are determined by events that occur outside of Minnesota.

Third, an evident connection exists between the needs of major political parties who use a national convention to determine the national party's nominee for president and the statutory requirements for the ballot to be used in Minnesota's presidential nomination primary. These political parties are governed both by national party rules that address the selection of the national party's nominee at a national convention, and state law requirements for candidate placement on the general-election ballot, *see, e.g.*, Minn. Stat. § 208.03 (requiring the state party chair to "certify to the secretary of state ... the names of the party candidates for president and vice president"). **The national framework and Minnesota's statutory processes for the general election make it reasonable to provide a measure of control to the parties in deciding which names will be on the ballot for Minnesota's presidential nomination primary as candidates for the national party's nomination.** (emphasis added).

Uygur has suffered no violation of any rights. Uygur has no legal authority to force the South Carolina Democratic Party to associate with him. The challenged provision of the SCDP Plan (and South Carolina election law) exists to protect SCDP's decision and to protect SCDP's fundamental right to freedom of association and is therefore constitutional.

## C. Plaintiff Uygur Has No Likelihood of Success in that SCDP's First Amendment Rights of Association, The Right to Determine Its Own Membership, and To Limit Its Candidates Are Fundamental Rights of SCDP.

*In Democratic Party of United States v. Wisconsin*, 450 U.S. 107 (1981) the Supreme Court held that the State of Wisconsin could not regulate the National Democratic Convention delegate selection plan as the National Democratic Party determined that the Wisconsin Democratic Party had violated Democratic Party Rules and refused to seat the Wisconsin Delegation. In its discussion, the Court recited the recognized rights of a political party to define and control their association rights and control who is a member and to create its own rules, stating:

> The *Cousins* Court [*Cousins v. Wigoda*, 419 U.S. 477 (1972)] relied upon the principle that **"[the] National Democratic Party and its adherents enjoy a constitutionally**

**protected right of political association."** *Id*., at 487. See also, *id*., at 491 (REHNQUIST, J., concurring). (emphasis added). This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State. *Kusper* v. *Pontikes*, 414 U.S. 51, 57; *Williams* v. *Rhodes*, 383 U.S. 23, 30-31. See also *NAACP* v. *Alabama ex rel. Patterson*, 357 U.S. 449, 460. And the freedom to associate for the "common advancement of political beliefs," *Kusper* v. *Pontikes, supra*, at 56, necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only. "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy* v. *New Hampshire*, 354 U.S. 234, 250; see *NAACP* v. *Button*, 371 U.S. 415, 431.

Here, the members of the National Party, speaking through their rules, chose to define their associational rights by limiting those who could participate in the processes leading to the selection of delegates to their National Convention. On several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions -- thus impairing the party's essential functions -- and that political parties may accordingly protect themselves "from intrusion by those with adverse political principles." *Ray* v. *Blair*, 343 U.S. 214, 221-222. In *Rosario* v. *Rockefeller*, 410 U.S. 752, for example, the Court sustained the constitutionality of a requirement -- there imposed by a state statute -- that a voter enroll in the party of his choice at least 30 days before the general election in order to vote in the next party primary. The purpose of that statute was "to inhibit party 'raiding,' whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Id*., at 760. See also *Kusper* v. *Pontikes, supra*, at 59-60.

*In Democratic Party of United States* at 120-121.

This lengthy quote from *Hero*, accurately and thoughtfully summarizes the recognized and fundamental interests of political parties to control their own membership and candidates, as well as the state's interests in supporting same:

The state has an interest in protecting a party's right to determine its own membership and limit its candidates to those party members. *Cf. Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952) (party loyalty oath); *Kucinich v. Tex. Democratic Party,* 563 F.3d 161 (5th Cir. 2009) (party loyalty oath); *Da La Fuente v. Cortes,* 751 F. App'x 269 (3d Cir. 2018) (sore-loser law); *S.C. Green Party v. S.C. State Election Comm'n,* 612 F.3d 752 (4th Cir. 2010) (sore-loser law). Implicit in the First Amendment is the freedom "to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 647, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (quoting *Roberts v. U.S. Jaycees,* 468 U.S. 609,

622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648, 120 S.Ct. 2446. **Political parties enjoy these associational rights like any other organization. And "[i]n no area is the political association's right to exclude more important than in the process of selecting its nominee." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000); *see also Maslow v. Bd. of Election in N.Y.C.*, 658 F.3d 291, 296 (2d Cir. 2011) ("The Supreme Court has emphasized— with increasing firmness—that the First Amendment guarantees a political party great leeway in governing its own affairs.").** (emphasis added)

Hero seeks to use the First Amendment as a sword, demanding "a certain degree of influence in[] the party." *N.Y. State Bd. of Elections v. Lopez Torres,* 552 U.S. 196, 203, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008). But his bold assertion finds little support in precedent. Including people unaffiliated with the party—or those with whom the party does not wish to affiliate—"may seriously distort [the party's] collective decisions—thus impairing the party's essential functions." *Democratic Party of U.S. v. Wisc. ex rel. La Follette,* 450 U.S. 107, 122, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981). "[P]olitical parties may accordingly protect themselves `from intrusion by those with adverse political principles,'" *id.* (quoting *Ray,* 343 U.S. at 221-22, 72 S.Ct. 654), so too can a state protect the First Amendment rights of a political party, as the Election Board did here by allowing the Republican Party to *777 determine its own membership and restrict its standard bearers to members in good standing.

Our conclusion aligns with two Eleventh Circuit opinions regarding a party's effort to exclude a candidate, David Duke, from its primary ballot. *Duke v. Massey,* 87 F.3d 1226 (11th Cir. 1996); *Duke v. Cleland,* 954 F.2d 1526 (11th Cir. 1992). (citing *De La Fuenta*, supra in fn.) The cases involve essentially identical facts. Georgia law established a committee to select the candidates for the presidential primary ballot. *Cleland,* 954 F.2d at 1527. Duke met the criteria, yet the Republican committee members successfully removed his name from the ballot. As a result, Duke and two supporters sued the Secretary of State and Committee (not the Georgia Republican Party). *Id.* at 1527-28. Twice, the Eleventh Circuit sided with the state. In the first case, the court agreed that the committee's action infringed upon Duke and his supporters' right to associate and vote. *Id.* at 1533. But Georgia "has an interest in maintaining the autonomy of political parties," which means the Republican Party "enjoys a constitutionally protected right of freedom of association." *Id.* at 1531-32. **Applying the "reasonable restriction" standard, the decision to exclude Duke easily passed muster.** Four years later, the Eleventh Circuit again denied Duke his requested relief, this time under strict scrutiny because the "state has a compelling interest in protecting political parties' right to define their membership." *Massey,* 87 F.3d at 1234. Both times, the interests of the party prevailed over that of a single candidate attempting to dictate an organization's speech.

**D. SCDP's Executive Council's Decision Not To Certify Uygur Was Entirely Reasonable and a Lawful Exercise of its First Amendment Rights of Association.**

Plaintiff Uygur was not certified by the SCDP Executive Council as a PPP candidate first and foremost for a very simple and indisputable reason – he was not in compliance with the SCDP Plan – he was not "legally qualified to hold the Office of the President at the time he sought certification.[5]

Uygur admits this fact in his Complaint, ECF 1 para. 23, in all of his filings, and in seeking a declaratory judgment that he believes the Natural Born Clause was repealed by the 14th Amendment.

*Just because Uygur believes and argues he was qualified* **does not mean that he was in fact qualified or that SCDP had to honor his opinion of his own status**. It should be obvious to Mr. Uygur, and this Court, by Uygur's own litigation, that Uygur's legal position is tremendously uncertain as no binding legal precedent exists that directly supports Uygur's claims. In fact all known legal precedent exists to the contrary. ECF 46 Plaintiff's Consolidated Reply p.5 fn. 1 and 2. Further, the vast majority of Constitutional legal scholars do not support Uygur's argument.

That Uygur needs this declaratory judgment action to try to establish, for the first time in any Court, his "legal qualification to hold the Office of President" demonstrates the very reason why he was not certified by the SCDP Executive Council – **he was not actually legally qualified at the time he sought candidate certification and as such shows why the decision and actions of the SCDP Executive Council were entirely reasonable.**

The SCDP was well within its First Amendment rights to choose not to associate itself with Uygur as a "possibly-maybe-but not likely-qualified candidate." *Cal. Democratic Party v.*

---

[5] Additionally, he did not provide proof of his efforts to be on the primary ballot in 6 other states as was required by the SCDP Plan and as did the other candidates. See Ex. A – Parmley Aff.

*Jones,* 530 U.S. 567, 575, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000); *see also Maslow v. Bd. of Election in N.Y.C.,* 658 F.3d 291, 296 (2d Cir. 2011) ("The Supreme Court has emphasized— with increasing firmness—that the First Amendment guarantees a political party great leeway in governing its own affairs.").

As discussed in great detail *supra*, the SCDP Executive Council could have also decided Uygur wasn't a *bona fide* Democrat by whatever metric they chose to define that term and refused to certify Uygur on that basis alone. Per all known case law, that determination would have been constitutionally permissible and consistent with the SCDP's First Amendment right of association. *See De La Fuente, supra, passim*.

In *Duke v. Massey,* 87 F.3d 1226 (11th Cir. 1996) and *Duke v. Cleland,* 954 F.2d 1526 (11th Cir. 1992) the Georgia Republican Party excluded and refused to certify the vile racist David Duke as a Republican candidate for its PPP despite Duke meeting all known qualifications. Georgia Republicans were constitutionally permitted to exercise their First Amendment rights to exclude associating themselves with Duke because they didn't like his views, what he stood for, and his potential effect on their PPP.

Georgia Republicans then, just like South Carolina Democrats in the case at bar, have the Constitutional right to choose with whom they wanted to associate and participate in their PPP.

The SCDP Executive Council reasonably exercised their First Amendment Rights and determined that they didn't want Uygur in their PPP as he was not legally qualified to hold the Office of President, and as such, did not certify him as candidate, in accordance with the SCDP Delegate Selection Plan that is based upon, and in accord with, the Democratic National Delegate Selection Plan.

Democrats, including South Carolina Democrats, by and through their delegate selection plans, only want to nominate candidates and award delegates, in accord with the National Democratic Nomination Plan to candidates who are legally qualified to hold the Office of President. There is no question that this process and the First Amendment rights of the SCDP and National Democratic Party allow them to do this expressly. Implicit in the freedom of association is a political party's substantial interest in ensuring that party members have an effective role in determining who will appear on a general election ballot as that party's candidate. See, *Democratic Party of U.S.* v. *Wisconsin,* 450 U.S. 107 (1981).

At the Democratic National Convention, SC Democrats don't want any of their delegates potentially counted and controlled by a candidate who is unable to hold the office or by virtue of being a participant, threatens and affects how delegates are awarded to other qualified candidates. Just as the State has an interest in how it conducts its elections, the SCDP has that same interest "in protecting the integrity and practical functioning of its political process" by ensuring an orderly PPP free of any confusion, dilution of votes, and free from any potential interference in the award and allocation of Democratic delegates to unwanted and/or unqualified candidates. See *Haase v. Silver*, 140 F. App'x 274, 277 (2nd Cir. 2005) (holding that "an individual who does not fit within the parameters determined by a party does not have an absolute right to participate in that party's primary election")

South Carolian Democratic voters have a right to vote for a candidate who is <u>known</u> to be a candidate capable of holding the office of President. The delegate selection protects the integrity of their primary ballot and its place in the national delegate vote plan. Should SCDP be forced to place Mr. Uygur on the PPP ballot, and he wins, and he is thereafter legally disqualified from holding the Office of President – then what? Forcing SCDP to place Uygur on the PPP ballot not

only places the entire South Carolina delegate votes and allocation at risk, but most importantly unconstitutionally forces SCDP to have Uygur as an uninvited and unwanted part of their PPP in violation of SCDP's First Amendment rights.

**E. Ward Has No Standing to Challenge SCDP's Actions**

Plaintiff Ward, who does recite that he is a Democrat, states a desire to vote for Plaintiff Uygur as show of solidarity with Mr. Uygur's policies and ideas. The cases cited as to Article III standing and injury to Plaintiff Ward all deal with recognizing the right to vote for a candidate in a general election as establishing Article III standing. See, e.g., *Anderson v. Celebreeze*

As is discussed in great detail *supra,* the decision of the SCDP not to certify Plaintiff Uygur does not prevent Uygur from appearing on the Presidential general election ballot and Plaintiff Ward can then vote for Plaintiff Uygur and fulfill his desire to show solidarity and support. Ward's ability to vote for Uygur in the General Election is completely unaffected by the actions of the SCDP and thus form no basis to establish Article III standing.

Additionally, defendant believes, but is not certain, that its PPP allows for write-in candidates. *See López Torres,* 552 U.S. at 207-08, 128 S.Ct. 791 (recognizing that candidates' and voters' associational rights are "well enough protected" if there is "an adequate opportunity to appear on the general-election ballot").

## CONCLUSION

Defendant SCDP has lawfully exercised its First Amendment Rights and has reasonably and rationally chosen not to have Plaintiff Uygur participate in its PPP. There is absolutely nothing unconstitutional or unreasonable about this lawful exercise of SCDP's constitutional rights of association and Plaintiffs' Declaratory Judgment Action must be dismissed.

Further Plaintiffs cannot show: (1) that plaintiffs will likely succeed on the merits; (2) that plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiffs' favor; and (4) that the granting of the injunction is in the public interest and as such, their Motion for Injunctive Relief must also be denied.

Respectfully Submitted,

**ATTORNEY FOR PLAINTIFF**
**SOUTH CAROLINA DEMOCRATIC**
**PARTY**

*/s/ Richard A. Hricik*

_____
Richard A. Hricik (#16871)
THE LAW OFFICES OF
RICHARD A. HRICIK, PA
941 Houston Northcutt Blvd. Ste 204
Mt. Pleasant, SC 29464
(t) 843.849.0136
Richard@CharlestonLawyer.com

Charleston, South Carolina
January 9, 2024